HOME INSURANCE AGENCY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 3288. Promulgated January 8, 1927.

The petitioner was not a personal service corporation during the years 1918 and 1919, as its income could not be ascribed primarily to the activities of its principal owners or stockholders who were regularly engaged in the active conduct of its affairs.

*David A. Gates, Esq.,* for the petitioner.
*J. Arthur Adams, Esq.,* for the respondent.

This proceeding results from the determination by respondent of deficiencies in the amounts of $1,674.37 and $2,827.52 for the taxable years 1918 and 1919, respectively. The deficiencies are due to the respondent's determination that the petitioner was not a personal service corporation.

### FINDINGS OF FACT.

The petitioner is an Arkansas corporation organized in 1905 to consolidate and continue the business of four insurance agencies then operating at Pine Bluff. Its original capital stock of $17,000, which was divided into 680 shares of the par value of $25, was issued for the so-called expiration lists of the four predecessors, in proportion to the amount of business done by each during the preceding year of 1904. The total commissions of the predecessors for such year amounted to $16,928.72. Cash totaling $71.28 was paid in by several of the incorporators to bring the capitalization up to the $17,000 par value of the stock issued, and to make necessary adjustments so that fractional shares need not be issued. The persons to whom stock was issued, the number of shares issued, and the name of the business taken over, were as follows:

| Name. | Number of shares issued. | Predecessor business. |
|---|---|---|
| George M. Wells | 104 | George M. Wells & Co. (a partnership) |
| Russell Hollis | 105 | |
| E. B. Bloom (individually) | 1 | Travelers Fire Ins. Co. (a corporation) |
| E. B. Bloom, Trustee for Travelers Fire Ins. Co | 169 | |
| F. M. Rosenberg (individually) | 1 | Bell-Vernon Co. (a corporation) |
| F. M. Rosenberg, Trustee, (beneficiary unknown) | 157 | |
| W. Z. Tankersly | 143 | Individual business |
| Total shares issued | 680 | |

The expiration lists which formed the basis for the stock issue were entered on the books as a good will asset. The book value of this item was reduced from $16,982.72 to $13,000, in 1909, and in 1910 to $10,000, and continued to be carried at that value through the years in question.

Prior to 1918, Bloom and Hollis had retired and sold their stock, held individually or as trustee, to the other stockholders. In 1917

the capital stock was reduced from $17,000 to $7,000, divided into 280 shares, each of the par value of $25. This change was effected by charging $10,000 to capital stock and crediting that amount to surplus. The holdings of each stockholder were reduced proportionately. The stockholdings during the years in question, as shown by the books, are as follows:

| Stockholder. | January 1, 1918. | | December 31, 1919. | |
|---|---|---|---|---|
| | Shares. | Per cent of total. | Shares. | Per cent of total. |
| F. M. Rosenberg | 1 | 00$\frac{4}{14}$ | 38 | 13$\frac{9}{14}$ |
| F. M. Rosenberg, Trustee | 40 | 14$\frac{4}{14}$ | | |
| S. F. Rosenberg | 42 | 15 | 42 | 15 |
| G. M. Wells | 74 | 26$\frac{6}{14}$ | 64 | 22$\frac{12}{14}$ |
| W. Z. Tankersly | 107 | 38$\frac{3}{14}$ | | |
| G. M. Wells, Trustee | 16 | 05$\frac{12}{14}$ | 16 | 05$\frac{12}{14}$ |
| W. C. Reynolds | | | 40 | 14$\frac{4}{14}$ |
| Mrs. Annie L. Tankersly | | | 60 | 21$\frac{6}{14}$ |
| Mrs. Mary Adams | | | 20 | 07$\frac{2}{14}$ |
| Totals | 280 | 100% | 280 | 100% |

In August of 1918, W. Z. Tankersly died and his stock was inherited by his widow, Mrs. Annie L. Tankersly, and his children. However, no changes were made on the stock books until March, 1919, when 60 of his shares were transferred to his widow, 20 to Mrs. Mary Adams, his daughter, and the remaining 27 of his shares to W. C. Reynolds, who had purchased them, together with 13 shares from other stockholders, for about $40 per share. Mrs. Annie L. Tankersly and Mrs. Mary Adams received no salaries and rendered no personal service to the corporation during the years 1918 or 1919. The certificate showing 40 shares issued to F. M. Rosenberg, trustee, was canceled in March, 1919, and the shares were reissued, 38 shares to F. M. Rosenberg, individually, and 2 shares to W. C. Reynolds, who had purchased them as a part of the 40 shares acquired by him at that time. We are unable to determine from the record the terms or conditions under which F. M. Rosenberg, trustee, and George M. Wells, trustee, held stock in the corporation during the years in question. S. F. Rosenberg received no salary and did not render personal service to the corporation during the years 1918 and 1919.

The officers and stockholders to whom salaries were paid during the years in question, and the salaries paid each, are as follows:

| Officers. | Salary. | |
|---|---|---|
| | 1918. | 1919. |
| W. Z. Tankersly | $1,200 | |
| G. M. Wells | 3,120 | $2,700 |
| F. M. Rosenberg | 3,000 | 2,700 |
| W. C. Reynolds | | 2,150 |

Tankersly was in failing health during that portion of 1918 ending with his death in August of that year, and was able to give only a part of his time to the business. The other officers were actively engaged in the conduct of the business, devoting all their time to its affairs. The success of the business was largely due to their activities. At least 90 per cent of the business done in 1918 was acquired through the efforts of Tankersly, Wells and F. M. Rosenberg. The other stockholders listed above devoted no time to the petitioner's affairs and drew no salary. There was an undisclosed number of non-stockholders employed in a clerical capacity who took no part in the solicitation of business.

The petitioner's business consisted almost entirely of acting as local agent for about thirty insurance companies. The petitioner was authorized to issue insurance contracts on behalf of the companies it represented and it assumed responsibility for the collection of premiums. Bad debt deductions were claimed on account of uncollectible premium accounts. It was allowed 45 days in which to remit to the companies it represented. The practice of petitioner was to allow credit to policyholders for 30 days in addition to such 45-day period. Due to the largest volume of business being placed in the last three months of the year when the cotton crop was harvested, there were occasions when additional time for credit was extended to policyholders. The credit relations between the petitioner and its policyholders on the one hand, and between the petitioner and the insurance companies represented on the other, as of December 31 of each year, may be set out as follows:

| Year. | Amounts received by petitioner in lieu of cash. | | | Amounts owing to insurance companies. | Premiums paid by pet. before recd from policyholders (round figures). |
|---|---|---|---|---|---|
| | Notes. | Open accts. | Total less estimated commission. | | |
| Dec. 31, 1918 | $8,151.85 | $29,482.69 | $33,383.00 | $12,239.62 | $21,000.00 |
| Dec. 31, 1919 | 5,975.91 | 32,670.41 | 31,716.00 | 21,092.86 | 11,000.00 |

The $12,239.62 given as premiums owing the home companies was stated to be less cash on hand (in amount now shown). Cash on hand (in the amount of $14,491.39) was not deducted from the corresponding figure due for 1919. The notes receivable for 1918 drew interest at a rate of from 7 per cent to 10 per cent, and those for 1919 from 7 per cent to 9 per cent. In years prior to those in question the petitioner, by indorsement, discounted some of the notes at the bank. The record is silent as to whether any of such notes were so discounted during the years in question.

Assets in the business as of January 31, 1918, in addition to the good will item and the accounts and notes receivable, listed above, were:

| | |
|---|---:|
| Liberty bonds and county warrants | $2,337.50 |
| Furniture and fixtures | 889.61 |
| Tax lands | 34.67 |
| Total | 3,261.78 |

The liabilities as of that time were not established, except for the $12,239.62 item owing to insurance companies and $7,000 representing capital stock. The total assets and liabilities as of December 31, 1919, are not in evidence.

The petitioner borrowed money from time to time on the credit of its stockholders. These amounts were represented by bills payable and are shown month by month, as follows:

| Date. | 1918. | 1919. |
|---|---|---|
| January 1 | None. | None. |
| February 1 | $5,000 | None. |
| March 1 | 5,000 | None. |
| April 1 | None. | $1,000 |
| May 1 | None. | 1,000 |
| June 1 | 2,000 | 3,500 |
| July 1 | 5,000 | None. |
| August 1 | 3,000 | 2,500 |
| September 1 | 3,000 | 2,500 |
| October 1 | None. | 2,500 |
| November 1 | None. | None. |
| December 1 | None. | None. |
| Monthly average | 1,900 | 1,000 |

The income of the petitioner was derived almost entirely from commissions on insurance policies written. During 1918, the only other source was real estate and loan commissions totaling $289.86. About 75 per cent of its business was fire insurance. The remaining 25 per cent was approximately half tornado and half casualty insurance. The total premiums on policies for the years 1918 and 1919 were $131,154.66 and $143,596.92, respectively. The gross commissions earned were $22,644.62 in 1918, and $22,190.00 in 1919. The net earnings for 1918 were $6,961.46. Net earnings for 1919 can not be determined from the record. It was the practice of the petitioner to distribute the profits as dividends as soon after the close of the year as possible. The dividend distributing 1918 earnings in the amount of $6,300 was declared March 28, 1919.

### OPINION.

MILLIKEN: Section 200 of the Revenue Act of 1918 prescribes three requirements of a personal service corporation, to wit: (1) The income of the corporation must be ascribed primarily to the activi-

ties of the principal owners or stockholders. (2) Such principal owners or stockholders must themselves be regularly engaged in the active conduct of the affairs of the corporation. (3) Capital (invested or borrowed) must not be a material income-producing factor.

Failure to comply with any one of these requirements is fatal to a claim that a corporation is a personal service corporation. In the case of *Matteson Co.* v. *Willcuts*, 12 Fed. (2d) 447, it was pointed out that this provision, permitting a certain class of corporations to be taxed on the same basis as a co-partnership, was in the nature of a concession to those corporations whose functions were primarily personal service in character, which service was rendered to its patrons in a manner similar to the way a partnership rendered the same kind of service, and where such corporation did not require any considerable amount of capital and such capital as was actually employed was not a material income-producing factor. The necessity for strict compliance with the requirements of the statute is aptly stated in the case of *Matteson Co.* v. *Willcuts, supra,* the court saying:

> Every corporation has full control of its own activities. It knows what the requirements of a personal service corporation are. It may comply therewith and easily keep within the limits thereof if it so choose, or it may not if it otherwise prefers. If it does not fairly observe and keep within the requirements of the law, it should not claim the benefits which the law confers. To nearly comply with the law, or to come within hailing distance thereof, is not enough.

And, in discussing the first requirement of personal service status, the court said:

> It is not necessary under the law that each stockholder shall be engaged in rendering the personal service, but the letter and the spirit of the law both require that the great body of the stock shall be in the hands of those who are rendering this service.

In the case of *Matteson Co.* v. *Willcuts, supra,* some doubt was expressed whether 16 per cent of the stock being held by a stockholder, who rendered no personal service, would be sufficient to defeat personal service classification. However, after holding that an additional 20 per cent of the stock was owned by one not regularly engaged in the affairs of the corporation, the court was clearly of the opinion that the condition was not met.

In the case at bar, during the year 1918 there was outstanding in the hands of stockholders, who rendered no personal service and received no salaries, 35 per cent of the stock of the corporation. F. M. Rosenberg, trustee, held for undisclosed persons 40 shares of stock, and we are not advised as to the terms or conditions under which the stock was held. S. F. Rosenberg held 42 shares of stock

and rendered no service to the corporation. George M. Wells held, as trustee, 16 shares of stock. One witness testified that this stock was held for his wife, but we are not advised as to the terms or conditions upon which it was held. It should also be noted that W. Z. Tankersly, who was the owner of 107 shares of stock of the corporation, was in failing health during the year 1918 and unable to devote his entire time to the business of the corporation prior to his death in August, 1918, and upon his death his stock passed by inheritance to his widow and children, who rendered no service to the corporation. During the year 1919 there was outstanding in the hands of stockholders who rendered no personal service, 49-4/14 per cent of the corporate stock. S. F. Rosenberg held 42 shares, (same as in the year 1918); G. M. Wells, trustee, 16 shares, (same as in year 1918); Mrs. W. Z. Tankersly, 60 shares; and Mrs. Mary Adams, 20 shares. The latter two stockholders were the widow and daughter, respectively, of W. Z. Tankersly, and rendered no personal service to the corporation.

It is manifest that the non-active stockholders held too large a percentage of the total stock to justify a holding that there was a substantial compliance with the first prerequisite laid down by the statute. Such being the case, it becomes unnecessary to consider the remaining requirements of the statute as a prerequisite to personal service classification.

*Judgment will be entered for the Commissioner.*